May it please the Court, my name is Bruce Paolini, I'm the plaintiff and appellant in this matter and I'm representing myself. With me at council table today is Nanette Jocelyn. Ms. Jocelyn is an attorney admitted in California as well as before this Court. However, she will not be addressing the Court today. This case involves grants of some- Could you pull the mic up just a little, I think? Just push the arm up. Okay. I think that'll help. Is this better? Yeah. Thank you. This case involves grants of summary judgment by the Idaho District Court involving acceleration of vesting of stock options, wrongful discharge, and a promissory note. However, the Idaho District Court erred when it misinterpreted Idaho law and ignored relevant and important facts in this case. I'm going to begin by addressing acceleration of vesting, then wrongful discharge, and finally the promissory note. In doing so, though, I want to emphasize that these are three independent claims and they're not dependent upon each other. For instance, if the Court would determine that there is no acceleration of vesting, the Court can still determine that there was improper or wrongful discharge. Let me ask you this. You say you were fired and they say you left of your own free will. How could there be a dispute about that? Your Honor, I believe that I've disputed every single fact that Albertsons has set forth alleging that I voluntarily quit. Did you get a letter or something saying go away? No, I did not, Your Honor. I was locked out of the office on the day that I was on vacation. I was locked out while I was on vacation right after I had raised the acceleration issue with Albertsons. You also, at their request, had a meeting, did you not, at which you thought you were going to be considering the terms of a possible golden shoot umbrella or whatever it is, and they just fired you. They did, Your Honor. They told me that my career would be over if I continued to pursue the acceleration issue. And ultimately that's how this case arose. I was in charge of the layoff of 1,341 employees. And as I processed that layoff, I became concerned that there was acceleration of vesting of stock options within the company. When I raised it with the company, initially they ignored it, Your Honor. When I persisted, they told me I had to drop the issue or be discharged, and ultimately I was discharged. That brings me to my first issue, which is acceleration. Did they say that, what you just said? Did they say if you don't drop this issue, you'll be discharged? Because I thought that the testimony was that, maybe it's Mr. Young said something like, your career is going to be over or disfavored or you're not going to do well. In other words, something short of you're going to be discharged. Your Honor, he said, you're correct, he said that my career with Albertsons would be over. So did anyone else in the record say what you just said a minute ago, that if you don't drop this, you'll be discharged? Mr. Young was the only one who said that, Your Honor. Okay. So the testimony is that Young, is it Young? Yes. He was the Executive Vice President of Human Resources. Thank you. Bring me to my first point, acceleration of vesting. This case really arose when Albertsons discharged me for raising the acceleration issue on the eve of a massive layoff. Three days after I was discharged, I brought the acceleration issue to the plan administrator, which was Albertsons Board of Directors. However, after Albertsons told its administrator that there was no acceleration of vesting, the administrator's conduct was prejudicial against me for two important reasons. Number one, the administrator would not allow me to address Albertsons' arguments. Albertsons submitted an October 5, 2001 position statement to the administrator and did not allow me to see that position statement. And ultimately, the administrator relied upon many of the theories in that position statement to deny acceleration. Let me ask this. Who was the administrator? Was he the CEO or who was he? Your Honor, the administrator essentially was the company. It was the company's board of directors. I thought the administrator was a committee of a certain, not the entire board of directors of the company, but a committee of a set number of directors. Judge Gould, under the plan document, the board of directors is the administrator. The board can delegate its responsibility to committees. And in this case, it did delegate its responsibility to the compensation committee. And, Your Honor, it's interesting that it was the compensation committee because Albertsons is alleging here in this litigation that options and units are not compensation, even though the board of directors delegated this matter to the compensation committee. I thought they were arguing that they're not wages, even if they have some compensatory aspect to them. That's correct, Your Honor. The anti-retaliation statute here, 45613, provides that Albertsons could not discharge me or retaliate against me for raising a wage claim. I'm going to let you keep on your theme of that you thought there was an acceleration of vesting. Okay. I shall do that, Your Honor. So my first point was that I was not allowed to address Albertsons' arguments, and the administrator ultimately denied my request for reconsideration. Secondly, and most importantly here, Your Honors, we have a situation where the administrator did not consider the plan document. The administrator made its decision on the basis that the plan document is irrelevant. We have testimony from the chairperson of the administrator, Clark Johnson, who testified that not only he, but all of the other members of the administrator, deemed the plan document to be irrelevant. Excuse me. So I don't want to interrupt your flow of argument, but I want to let you at least address the issue that's on my mind. I thought more precisely what they said was that because they thought there was not a reorganization, in other words, the vesting would occur on merger, consolidation, or reorganization where 20 percent of directors were changed, but because they thought there was not a reorganization that they didn't have to address whether it was irrelevant or whether the directors changed. Your Honor. Am I mistaken in that? You are, Your Honor. The chairperson of the administrator, when I asked him the very important question, did you apply the ordinary meaning of words in this plan document, his testimony to me was we never got to that because we deemed it irrelevant. Deemed it irrelevant. Why? Because they didn't consider the plan document, Your Honor. Essentially, we have a situation where they were administering a plan that they didn't consider. And that, Your Honor, is what's prejudicial to me. You know, essentially, we have here two kinds of conflict. One, we have a very substantial inherent conflict. We've got the board of directors of the company that's the payer of the claims making a determination. They have legal conflicts in that they owe me a fiduciary duty under Stern v. Williams, and they owe the company a duty to act in its best interest under Idaho Code Section 30-1-830. And most importantly here, in terms of the inherent conflict that they had, they were reviewing their own conduct. Then is it your position that the board of directors or a committee of the board could not serve as plan administrator? Your Honor, it's my position that they were they had a very serious inherent conflict. Okay, but is it your position that, again, my question is, is it your position that the board of directors or a committee of the board could not serve as plan administrator? In this situation, Your Honor, I believe that they were so conflicted that I could not get a fair determination. If that's your question, I could not get a fair determination from them. Your Honor, your position is that they could not serve as plan administrator in your case. Because they were so conflicted. Or is it because it seemed to me your briefs were going to that extreme as opposed to just arguing that their relationship to the company should affect our standard of review. That's correct, Your Honor. You're arguing that they really shouldn't have been acting here. Your Honor, I don't believe the Court needs to get to whether or not they should have been acting. I have not in my own mind considered that. In my own mind, I have said that I don't believe I could get a fair determination from the inherent conflict. But, Your Honor, you don't have to base your decision on that inherent conflict, because that translated into an actual conflict. How do you deal with the – okay, I understand your arguments that they didn't give you a fair decision. But how do you deal with the literal language of the plan? It says that the administrator decision will be final and binding, which seems to suggest that courts should give it some level of deference, like reviewing for whether it's arbitrary and capricious. And then second, the literal language about merger, consolidation, or reorganization, where 20 percent are changed. How do you deal with that word consolidation? And how do you deal with merger? And how do you deal with reorganization? I took it from your briefs that you're not arguing there was a merger or a consolidation in 2001. So you have to be arguing there's a reorganization. But you seem to be stressing the change in the number of directors as opposed to some of the things that traditionally are considered a reorganization. Your Honor, I'll address both points. With respect to Section 18, which you referred to regarding deference, Your Honor, Section 18 provides for deference only if the administrator interpreted the plan. Here we have a situation where there was no interpretation. They deemed the plan document irrelevant. I thought the plan administrator, and I might be wrong, but I thought the plan administrator in a written opinion expressly talked about what a reorganization was. And, Your Honor, that's the error of the district court. This Court has held in Scribner v. Worldcom that if an administrator improperly selects its desired result and then applies a label necessary to bring about that result, that's bad faith and there's no deference. Well, that's a separate argument. But didn't the administrator write an opinion talking about what reorganization was? Your Honor, they did. First give me a yes or no, if you can, and then go on and give your argument. Yes, Your Honor. The decision talks about reorganization, but that they hired a law firm to write that decision to be the label to hide the fact that they never considered the plan document. So you're saying they hired a law firm to write a rationale in the language of the plan document, but that they really didn't consider or look at the plan document? They deemed it irrelevant, Your Honor. Deemed it irrelevant. And that's what this Court held in Scribner v. Worldcom, that if you select your desired result, even though you write an opinion that applies the label, that's still bad faith. And that's why the testimony of the chairperson of the administrator, Clark Johnson, is so important in this case. Your Honor, if I may, I'd like to move on to your second question, which deals with reorganization. And, Your Honor, you respectfully fell into the trap that Albertson has set. Of course, I haven't fallen into a trap. Let me just explain. I haven't made a decision on your case, but I practiced corporate law, you know, for decades, and I have some experience as to what normally is considered a reorganization. So hence my question. I appreciate that, Your Honor. And, you know, when companies reorganize and change their corporate structure and they have NewCo or, you know, some phony name for a new corporation, and they get done with everything they're doing, and there's a different company that owns the assets, you know, I understand that as a reorganization. Now, here you're dealing with something very different, just a reduction in the board of directors' number and some management changes. And so I'm asking you to explain to me how that can be considered a reorganization under traditional precedent. Thank you, Your Honor. I appreciate those comments. Your Honor, the reason I set the trap is that Albertson's on page five of its brief cited the language the same way you said it to me. It said merger, consolidation, or reorganization. However, Your Honor, that's not what the language says. It says merger, consolidation, or reorganization of the company. And the three words of the company, Your Honors, is vitally important here. We're dealing with a reorganization of the company. And Albertson's conveniently leaves it out of its brief on page five of its brief. But a reorganization of the company is not a reorganization into another company or with another company. Your Honors, it's an internal reorganization, an internal reorganization defined by a 20% change in the board of directors. And the words of the company are very important because they appear twice in the language. It's a reorganization of the company, and the trigger for a 20% change in the board is incumbent directors of the company. We're dealing here with a change in incumbent directors. It does not say incumbent directors replaced by non-incumbent directors, as Albertson's asserts. Well, I think you've got a pretty good argument that there's a change in the number of directors is a change of directors, even if there aren't new ones coming in. At least that's a fair argument. But still, how can we say that the plan administrator is arbitrary and capricious in determining that this isn't a reorganization? Because, Your Honors. A reorganization of the company. I mean, you're putting a lot of weight on of the company, but still a reorganization of a company is traditionally at least, maybe you can argue something different here, but traditionally it does mean a change in the structure of who owns the assets, who the company is. And it's in that series with a merger where a new player comes in or a consolidation where two corporations become one or more become one. You know, in reorganization, usually it does involve some sort of shifting around of the corporate structure. Your Honor, here the Court is obligated to follow the ordinary meaning of words. Why? Because Idaho law provides for it, and that's what this Court held in scrutiny of the World Comp. I thought that there was an Idaho case, and now I'm probably going to think of the wrong name of the case. City of Chubbuck. A case where they said that they applied a legal meaning of a plan when they were interpreting disability benefits. And you'll probably remember which case.  Yes, Your Honor. When they said sole cause meant dominant cause, that it had to have a legal, they would give it sort of a legal meaning. Your Honor, that's correct, if there is a settled legal meaning. But there is no settled legal meaning for the term reorganization in Idaho or anywhere else. Your Honor, if you look at Fletcher's on corporation and you look at Amsher, the definition is to reorganize again or anew. It's the same definition as the ordinary meaning that you will find in Webster's or in Carta or any other dictionary. And I've cited those to the Court, Your Honor. I'd like to move to wrongful discharge and take maybe a minute because I wanted to reserve some time for rebuttal. We'll give you a little extra time because I took up a lot of your time on my question. I'm wondering who's arguing this case. With respect to wrongful discharge, Your Honors, Albertson's, as Judge Hill pointed out, alleges that I voluntarily quit. The district court found a question of fact with regard to that. I've submitted substantial evidence to the contrary, and I'm not going to address that further with the Court. However, Albertson's also claims that my action was self-serving, and I would like to address that, Your Honors. I raised the acceleration issue with Albertson's for a full week before I exercised my options, three days before a massive layoff of 1,341 employees. The company would not address it. They put me in a position where I had to question acceleration. And acceleration for me, Your Honors, meant acceleration for everyone under that stop-option plan. There was acceleration for one person. There was acceleration for everyone. There's a criminal statute that if people were laid off without all of their compensation due, that I could be liable. So, Your Honors, I had an obligation. Albertson's admitted that obligation to the district court. It made a judicial concession, but the district court ignored it. The district court went on to find that I had no obligation to raise the acceleration issue with Albertson's, and that Albertson's could discharge me. But, Your Honors, there's legal authority that I had an obligation. There's Idaho Code Section 30-1-842, as well as the Court of Appeals case of Jordan v. Hunter. Under those provisions, I owed Albertson's a fiduciary duty, a duty of care, and a duty to act in the company's best interest. I had to raise that issue with Albertson's, and I could not be discharged for doing it. I was protected by three separate protections, exceptions to the employment at will doctrine. Number one is a statutory exemption, 45-613. Secondly was the implied covenant of good faith and fair dealing. And thirdly was the public policy that I had an obligation. I'm limited on time, but I am. Let's add seven minutes to the clerk here, so you'll have time to present what you want. Thank you very much, Your Honor. I would like to address first my statutory obligation, if I may, because it's very important. Idaho Code Section 45-613 prohibits retaliation. It specifically prohibits retaliatory discharge. However, it has to be a wage claim under Section 45-601. But 45-601, Your Honors, is defined by compensation. It's defined very broadly by compensation. And, you know, I cited a lot of evidence in my briefing that this was compensation, but the most important evidence here is the fact that the administrator itself found twice in its decision that options and units are compensation. Nonetheless, Albertson still is asserting that it's not compensation, despite two findings by the administrator. I believe that Albertson should be foreclosed from continuing to assert that options and units are not compensation. But even if the court doesn't want to go with that and finds the question a fact, under two Idaho cases, Neal v. Idaho Forest Industries and Goff v. HJH, the court has held that whether something is compensation is a question of fact for a jury. And here, Your Honors, I believe you should allow this to go forward as a question of fact at a minimum. But if you want to look at this as a matter of law, if you look at the Idaho cases on what is compensation, you'll find on one side bonuses, severance pay, and deferral accounts. The only thing in Idaho that's not compensation is life insurance. And that's what Albertson's and the district court sees upon to say that stock options and deferred stock units are like life insurance. They're not at all like life insurance. Let me ask you a question about your theory of the case. Can the retaliatory discharge claim be made if it turns out that the stock options hadn't vested, but you thought they had vested? In other words, if you were making a good-faith complaint that you think your options had vested, and let's say it turns out the law says they hadn't vested, but you're assuming you're fired because you make this demand for your options, does that make out a claim under Idaho law? Or does your retaliation claim depend on your success in urging that the options had vested? Your Honor, I don't believe it does. I was unable to find any Idaho case directly on point, but I cited you to an American business law journal that surveys all cases across the country. And that law journal article says that if someone has a reasonably held belief that something is compensation and they pursue it, even if they're wrong, they should be protected. And that's the law in a majority of the states. And I think it's a well-reasoned position that the Idaho Supreme Court would accept going forward, Your Honors. The other point with respect to compensation, it's very important to point out, Your Honors, the deferred stock units here were a little different than the stock options. That was hypothetical stock that was placed into an account and paid me regular quarterly dividends. And the important part of that is Alpertson's asserts in its briefing that those quarterly dividends were contingent upon profitability of the company. However, they have no evidence in the record to prove that. The deferred stock units also contain a covenant not to compete for over three years. They are not a fixed benefit of employment status because they continue beyond employment status. Your Honors, what we have here, and this moves me into my next argument, the implied covenant of good faith and fair dealing. We have a contractual provision that I satisfied all contractual obligations. I exercised my options because I had an express contractual right to exercise my options in units to determine whether or not there was acceleration. In fact, I had an obligation. And when I did that, they discharged me. And, you know, I had a right to exercise those options. And when they discharged me, Your Honors, they triggered a covenant not to compete for over three years. I don't know how the Idaho District Court could ignore that. Very compelling evidence in my mind, Your Honors. With respect to public policy, I've already talked about my obligation. The District Court erred with respect to public policy, Your Honors, because the District Court did not recognize that what is the public policy is a question of law. But whether or not my action was in furtherance of that policy is a question of fact. And the District Court didn't get that right. With respect to my obligations, Your Honor, I mentioned before there's a criminal statute, Idaho Code section 45609, where the company would have been subject to criminal sanctions if it laid off people improperly. And I was right in raising this with the company. And I believe, Judge Gould, you're correct that even if for some technical reason, even if the court applies some very technical definition to reorganization of the company, which I don't think it should do, but even if the court applies that very technical definition, Your Honor, I shouldn't get my head cut off for raising my hand about the question of acceleration of vesting. Finally, Your Honors, I'll move to the promissory note and I'll be very brief. With respect to the promissory note, the promissory note does not contain an integration clause. There's no requirement that any change be in writing. And, Your Honor, there was a September 11, 2000 letter that extended that promissory note. And that promissory note was conditioned on my continued employment. And because it was conditioned on my continued employment, there's at least a question of fact for the jury as to what that means. That's what the Idaho District Court found. It found a question of fact with regard to that, but said we're not going to recognize the September 11, 2000 letter extending the note. We're going to ignore that letter and not count it as an amendment or addition to the contract. But they erred because they did not recognize that there's no integration clause at issue. I'll reserve a minute for rebuttal, Your Honors. Thank you very much. You're welcome. Mr. Sinclair. Pardon me? He was in Puerto Rico. So if you came here from the islands, you may be the one who traveled the furthest for the argument. I want to raise a procedural point here. You were the cross-claimant on the note, isn't that correct? On the promissory note, correct. Right, right. So that possibly he needs an opportunity for rebuttal to whatever you say about that. That would be fine. So I just wanted to make that point. That's correct. And we'll give Mr. We'll give you, Mr. Sinclair, time to cover whatever you need to cover. And then we'll give Mr. Paolini more time if he needs it. Okay. And depending upon how. This is the only case we have set today, so. Fair. Depending upon how the questioning goes, we're tentatively going to take about 12 or 13 minutes myself, leave about five minutes to Mr. Chandler in regards to the wage issues, and a couple, three minutes to Mr. Severson. Can you please speak up, sir? And a couple, three minutes to Mr. Severson if we get to the promissory note issues. I think the acceleration is obviously one of the first things that the court looked to. And Judge Gould, you did identify exactly what our position is in regards to this. There was not a reorganization. Now, Mr. Paolini argues differently. But the question is whether or not the administrator made a reasonable determination in regards to that. If you look at the letter from Mr. Paolini's then-attorney, Robert Stoll, which is on page 218 of the record. At page 219, he says, quote, our interpretation seems at least as reasonable, if not more reasonable, than the company's interpretation. Under the law, all the administrator has to do is make a reasonable determination, something that they have, in fact, admitted in their own letter. As indicated in Barnett v. Kaiser Foundation Health Plan, the touchstone is not whether the interpretation is correct, but whether it is a reasonable interpretation of the plan. I guess, counsel, the issue here is whether there is a sufficient conflict of interest that someone else should have been called upon to decide or whether we scrutinize it de novo. I think the – I personally think it's pretty clear that it's an arbitrary and capricious standard unless you find actual conflict. Now, what has been alleged in the record is some theoretical conflict. The board of directors, for example, is the plan administrator. Now, again, the court has corrected. In this case, the plan administrator was not the full board. It was a compensation committee. It was four individuals. What conflict did they show? It's not in the disinterest of those four individuals to accelerate these stock options. They all had stock options. But they're acting for the plan and for the company, are they not? Sure. But as you notice, in 1999, when we did do a reorganization, we declared that it was a change of control, and we accelerated all the stock options, and Mr. Palini executed all of the stock options, which is how we got these promissory notes. I understand that. And all of these stock options are on the books as liabilities. They're all going to come vested at some point in time. We fully intend people will exercise them. I mean, the corporation gives these not with the intent not to ever pay them, but with the full expression that we hope that people will exercise them and continue to invest in the company and align their interests with the company's interests. So letting them accelerate their stock options is not anything that is a problem with us. If you look at the financial impact upon that, upon the company, it's negligible in regards to the total economic changes that are occurring in 2001. As I understand the plan, there are set periods upon which one can exercise and they mature, but if anyone is no longer an employee for whatever reason, their stock options are automatically canceled, is that right?  Yeah. They're terminated. Terminated to make sure. Now, if Mr. Paolini was an at-will employee and the company let him go for whatever reason, downsizing or whatever, then he loses those options, is that right? That would be correct, although for the people who were released from employment, we gave them an extra 60-day period, but still there was a limited period in which they could invest in exercise or options. That's correct. But you didn't allow him to do that. We gave him the period to exercise anything that had been vested, but not the ones that weren't vested. What was the normal vesting period? What was the normal vesting period? I think at a five-year vesting period, then you have 10 years to exercise, something along that line. So his options, in 1999, there's a change of control with the acquisition, and all the options he had to that point vested. No, they hadn't, but they vested at the time of the change. They vested because of the change. Right, and he exercised, I think, all of them. I understand. So now he's got sort of a clean slate, but he starts getting new options. Correct. Under the new company's management, and then it's those options haven't yet vested in 2001. Right. It's only about an 18-month period we're talking about, and that's exactly what Clark Johnston said, who was the chairman of the plan administrator. He looked at all the indications that Mr. Palin had raised, all the issues that he'd raised about the corporate governance guidelines and the change of the CEO and reducing some stores, and he said, you know, this is the normal aftermath of taking two of the largest grocery stores in the country and merging them in 1999. We went from under 1,000 stores, known as Albertsons, to over 2,400 stores. We went from under 1,000, well, we went from about, I can't remember, 30,000 employees to 250,000 employees. Those aren't the right numbers, but that's the magnitude of change. We went from a 14-person board of directors to a 19-person board of directors. All we're doing in 2001 is we're analyzing the changes that have been occurring as a result of this merger, and we're trying to, under the corporate governance guidelines, readjust the company so we can get back to a good, solid base. Interestingly, it's the board of directors who decides to reduce the size of the board of directors. Talk about change of control. What is the change of control? The people who are suggesting this change were, in fact, on the board. And who was removed from the board? Nobody actually was removed. Five people resigned. The corporation didn't remove them. Somebody didn't do a stock pledge and vote new people in. Five people simply resigned. One person termed out, John Ferry. He turned 70, and under the rules, you can't continue to serve after you've turned 70. And Gary Michael stepped off the board in June. Well, let's assume for a minute, and you may tell me this question should be answered by Mr. Chandler. Assume that the district court was correct, that there wasn't a reorganization within the meaning of the plan or that the administrator should be upheld. Can there still be a claim for retaliation if an employee mistakenly asserts a claim to stock options and there's a retaliatory firing as a result? No. Okay. Now, are you covering those issues, or is that Mr. Chandler? I'll leave that to Mr. Chandler. So he'll get to that. Okay. All right. We'll go ahead then. To address some of the other issues that the court raised. Let me, before we leave this reorganization, you have a merger. Back in 99. Yeah. And then many changes are made in the succeeding years, which would naturally be the course, and it's part of the reorganization. When does the reorganization end? That's a good question. I guess it ends when they start doing something that's new, different from what is the result of what has already happened. There is a period of time, and this is not in the records, so it probably isn't considered. We couldn't sell a store. We couldn't do anything because the Attorney General prevented us from doing so. We were sued in California by the Attorney General on this merger, and they tried to stop it. We couldn't do anything for a period of time. Then we come in and we reanalyze, okay, what can we do and how can we do it? If you look at the press release, and I can find it in the record if you'd like me to, but the press release is discussing in July of 2001 the changes that are happening. They are talking about the profits we have that are merge-related, or the income we have that is pre-merge-related expense and post-merge-related expense, and they're still counting in July of 2001. Everything that we're doing is for financial purposes as a merger expense because it's still flowing from that, and that's exactly what Clark Johnson said. He said, and this is in the record, as in our brief on page 34, we consider the relevancy of change of control. I did not think the purpose was applicable to the situation you brought before us. We looked at the document but determined that what had taken place simply was the aftermath of a merger and was not relevant to what we were talking about, i.e., a change of control. And if you look at the decision, I think the Court made a very good point there, if you look at the decision, it outlines all the documents that were sent to all the people on the plan administrator. It outlines the discussion they had of those documents. It outlines the discussion they had of everything that Mr. Paolini presented, and it outlines the discussion they had in regards to what the attorney for Albertson's presented. I mean, Mr. Paolini is arguing that we should have, for some reason, sent him the memo that Albertson said. The general counsel and secretary for the corporation asked Mr. Paolini to submit anything he wanted to submit, and they submitted two letters, both of which went to the plan administrator. So when you look at this, there's no question they reviewed everything. They considered everything. There's no conflict of interest that's actually shown. There are just these allegations. There's no reason for the plan administrators to worry about accelerating them if they should accelerate them. They've done it before. They did it in 1999. Why wouldn't they do it again if that was in fact the case? They did have an opinion from legal counsel indicating that it wasn't a reorganization. They relied upon that. That was a reasonable interpretation. And, again, under Barnett, they don't have to be right. They just have to be reasonable. And for that reason, I think that we go that way. And regarding the fiduciary duty under Lang v. Long-Term Disability Plan, which is on page 16 of our brief, unless it's an ERISA plan, and it isn't. It's clear in the record. There's no allegation it's an ERISA plan. Unless it's an ERISA plan, there is no fiduciary duty owed to the plan participants by the plan administrator. So that eliminates this heightened standard that you might anticipate would exist, but it simply does not exist in a non-ERISA plan such as this. I would also point out just for the concept of the, you know, you said that there probably is a good argument that there was a reduction in the number of incumbent directors because five or seven directors did step down. If you look on page 479 of the record, every one of them was given a two-year special advisor contract to stay with the company and continue to give input and advice to the company. So it's not like they disappeared. Again, totally inconsistent with the change of control. Here are the people that supposedly are being changed of control and are given a contract and there are special advisors to the company for the next two years. In order to preserve some time for the wage issue, I'm going to defer now to Mr. Chandler. Thank you, sir. Mr. Chandler, you're covering the retaliatory discharge issues. I'm going to try to cover the discharge issues. The first one I would like to address is the claim that Mr. Paolini was discharged in violation of public policy. The Thomas, the Sorensen, and the Malone cases clearly establish that there are three branches to that argument, the public policy argument. Counsel, in the record, is there anything to show why he was discharged? There is in the deposition, I believe, of Steve Young, and basically Steve Young thought that Mr. Paolini had made all the signs, all the indicators that he was leaving, that he was quitting. In effect, he had quit in place and Steve Young said your last day will be August, I believe it was, 30. That's the extent of it. I think for purposes of the summary judgment motion, we have to accept Paolini's argument that he was discharged. So there's an issue of fact whether he was discharged or resigned, but for purposes of summary judgment, we have to consider he was fired. That's correct, Your Honor. My question was whether in the record it showed anything as to why he was fired. That would be in the testimony of Steve Young, the deposition testimony of Steve Young. That is also a disputed fact, I guess, because Mr. Paolini is sure that he was fired because of retaliation. That's correct. So that's another disputed fact. That is a disputed fact, but we have to accept for purposes of the motion for summary judgment that he was discharged. And that he was discharged for retaliatory reasons. I'm not sure that I can take it that far, Your Honor. Well, I'm just trying to figure out on summary judgment it's important to know what the positions are. And I agree with you fully that we accept Mr. Paolini's version of the facts. May I move on to the three branches of public policy? Yes. The first is that we cannot fire somebody because he refused to commit an unlawful act. And the example of that is firing an employee because he refuses to commit perjury. The Peterman v. Teamsters case out of California is the site there. The second branch is if somebody is fired for performing an important public obligation. And the cases under Idaho law relates to the obligation to report safety violations, violations of the electrical code, the obligation of an employee to respond truthfully to a subpoena, and the obligation of an employee to report environmental spills. In the Cray case, it was spilling arsenic into the groundwater, which would have a public impact for the population in the area. The third branch is exercising important rights and privileges. For example, talking about unions, filing a worker's comp claim, serving jury duty. And this is, I believe, in the days prior to the EEOC's guidelines on sexual harassment. It's the refusal to date a supervisor. None of these really apply to Mr. Paolini. He was performing the obligation of trying to exercise his stock options and deferred stock unit grants. There's no public interest in that. What if he was asserting that, yes, I should get $2 million for my options, but also all these other people that are being terminated in connection with the RIF program, some of them have vested options, too? That's true. But he did not assert that in his August 21 exercise of options and demand. In his severance letter, he didn't ask for anything be done for other people. I realize that. But in his discussions, according to his testimony, did he assert in his discussions with Mr. Young that people being terminated had vested rights? He asserted that he was worried that people about to be laid off, including executives which held very similar options, may have that right because there may have been a change in control. Now, if he was terminated for asserting that worry, would that be a retaliatory discharge under Idaho law? I don't believe it would be. The statute that he cites, 245-613, is interesting in that there are no annotations involving that statute that I have been able to discover. But it does require that there be a complaint that the person has not been paid wages in accordance with this chapter. So you have to go to wages, were options wages? And his attempt to exercise those options, was that a complaint? I disagree with the district court judge that that was a complaint. That was simply initiating the process, and there could not have been a complaint. It takes a lot of steps to bring it within the wage complaint retaliation. But what about just public policy? Why wouldn't it be a public policy argument that a person with HR responsibilities could voice a view about whether employees being terminated had vested stock option rights? As a matter of policy, of course he could raise that view. But how far do we have to endure him taking that view? He raised it with his immediate boss, Steve Young, and was told, no, it's not a change in control. He raised it with General Counsel Tom Saldine, and was told, we've considered this, and we've got advice from outside counsel that it's not a change in control. How much further? Let me ask this. I would assume that under Idaho law, that this contract would, in some senses, be deemed a contract of adhesion because it's drafted by the employer. And apparently what it is doing is giving stock options to people as compensation. It says it right in the opinion of the administrator, to get them to work harder, be loyal, contribute to the company. And then when they're terminated, not for cause, but terminated because of reorganization or other reasons, all of those options are taken away from them. Now, perhaps there's a public policy problem there. Where is the public? It's a limited number of employees that are offered these options, and they're offered them according to the terms of the plan, the plan prescribes how many days they have to exercise, in the event that they're terminated, recognizing the termination. If they've been vested. Pardon? If they have vested. If they have vested. They have. It's either 60 or 90 days, and my red light is. We'll give you some more time here because we gave more time to Mr. Paolini. But it's a very complicated thing that's going on here. It is. And, of course, an employee has the option to say, no, I don't want to take those options. No, that's not. Well, they don't have to take the options, but they're offered to them in order to give them incentive to give more contribution to the company. Work harder. This fellow claims he worked 80 hours a week. I understand that as a workaholic. So this is something that the company is doing it because they're getting some benefit from it. So then they cut the employee off, probably out of necessity for company reasons. But here's the individual then losing valuable compensation through no cause of his own. Losing whatever has not vested and whatever they may not have exercised. Key to your question on the retaliation is whether these options and the attempted exercise are wages under the Idaho wage statute. And I think that we've briefed that ad nauseum to you. But if they're assuming they're not wages and at least in my view, they haven't. They have a number of attributes that are unlike wages. They they're not paid on a regular basis. They may be issued, but they don't invest on a regular basis. However, if they're not wages, is there still the potential for retaliation and violation of public policy under Thomas? I don't think so. I think they have to be wages. And the Idaho Court of Appeals in the Whitlock versus Haney Seed case recognized that the cash value of the life insurance in that was at issue in that case. The cash value of the life insurance was compensation in the generic sense, but that did not make it wages under the wage statute. I think that the parallels between the Idaho statute and the California statute are sufficiently close that the Court should follow its decisions interpreting the California statute, the Bajorek and the Falcosky decisions. There's some difference in the statutes. Tell me what the difference is. The Idaho statute starts off wages mean compensation. California starts off wages include all amounts. They both then continue for labor performed by employees. I'm paraphrasing a bit. Idaho then says whether the amount is determined on a time, task, piece, or commission basis. California says whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis or other method of calculation. That other method of calculation really allows greater leeway under the California statute to have options determined to be wages, and yet the decisions have been that they are not wages. Okay. I will defer to Jeff Severson on the counterclaim issues. Okay. Good morning, Your Honor. I'll be very brief, as Mr. Panellini was, and just respond to I think the brief covers this pretty well, and it's a pretty simple issue, but I'll just respond to the issue that he brought up. A little bit of background. Mr. Panellini borrowed over half a million dollars from Albertsons, and he signed a promissory note promising to pay that back. The note had three modifications. The final modification said that the note was due in full on February 1, 2001. Mr. Panellini is trying to move that due date back to say that he had to be employed. Move it forward. Move it forward. He's trying to move it to January 1, 2002, and he's trying to do that through a letter that he wrote. In a sense, he's saying, you know, for example, assume you've loaned me $1,000 and I promise to pay you back next February 1st, and on January 30th, you write me a letter and say, or I write you a letter and I say, sorry, Justice Fletcher, I'd like to pay you this back in a year, and he says that that's enough to say that I don't have to pay you back February 1st. That's not the way it works. That's not the way a contract works. Was there a response to the letter? There was no response to that. Albertsons did not respond to that. Two days later, two days after he wrote that letter, Mr. Panellini signed the third and final modification saying I will pay this back by February 1, 2001. So, you know, even if there was a response to that, the note is what we look at, and the note has a specific due date, February 1, 2001. The letter is just to be disregarded. It's just a suggestion. The signing came after the letter. The signing came after, two days after the letter. That's right. So if there's no questions, I think that's it. I have no questions. Thank you. Okay. Mr. Panellini. Your Honors, I'll make just a couple points very quickly. With respect to acceleration of vesting, I believe Albertsons largely acknowledges that the administrator's conduct was unreasonable. The aftermath of the merger theory here, Your Honor, shows the unreasonable nature of the administrator's decision. The merger occurred in June of 1999. All of the options and units at issue here were granted after the merger. All of them provide for acceleration triggers based upon events that occur prospectively. None of them contain any provision that says we will look back to before the merger and count events that happened before the merger. The aftermath theory itself is a label that was applied. Secondly, Albertsons is essentially asserting to you that the administrator can sit around and say, we don't have to come up with the best decision here. We just have to look at the bounds of arbitrary and capricious and come as close to those bounds as we want to come. I believe that's unreasonable. Finally, with respect to acceleration, Your Honors, Albertsons had an opportunity in Section 2 of the plan document to define reorganization of the company, if they wanted to define it. There are 31 defined terms in Section 2, but reorganization of the company is not one of the defined terms. With respect to the promissory note, Your Honor, there was no notice given of delinquency or default. You will find nothing in the record because no notice was given, even though the deed of trust required that notice be given. With respect to my signing the third modification after I sent the letter, that's not vacation, Your Honors. The letter, the September 11, 2000 letter, references the third modification. It was done contemporaneously. And after I signed it, Albertsons, very importantly, deducted from my salary, as well as from my bonuses, payments. And that was a new term and condition. And they had to have a written agreement to do that under Idaho Code Section 45609. Thank you very much, Your Honors. Thank you, sir. I would like to raise a question. It's been an excellent argument on both sides. My question for the parties is, would there be any benefit to us deferring submission on this case and permitting the parties to use the Ninth Circuit's mediation facility for a period of time of 30 days or 60 days, or do the parties feel they have fully explored that possibility before and that we should just proceed to make our decision? So here from. Maybe we should let them advise us. Why don't I say this rather than put you on the spot here? If the parties want to have us, if both parties want us to defer decision for a period of 30 days to invoke our mediation processes of the Ninth Circuit mediator, we will do so. If the parties jointly tell the clerk that both parties want us to do that. However, if either party doesn't want us to do that, then we don't want to know which party it is and just tell the clerk that there won't be any mediation. I would just add that this case was decided on summary judgment and we're taking a very close look at whether there are any material issues of fact. And if there are, this could result in a very costly trial. All right. We have nothing to add then. So please, within the next week, let's say within the next 10 days, alert the clerk's office if the parties want us to defer submission for 30 days to invoke the Ninth Circuit's process. Okay. We thank both sides for their skillful argument. The case is submitted. We'll withhold submission for 10 days. Thank you all. All rise. Court is adjourned.
judges: B. Fletcher, Gould, King